# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2024-2287
_____

RT-DESTIN ASSOCIATES, LLC,

Appellant,

v.

NEXPOINT REAL ESTATE
ADVISORS, L.P. and FNF
LAWYERS TITLE OF TEXAS, INC.
d/b/a LAWYERS TITLE COMPANY,

Appellees.

_____

On appeal from the Circuit Court for Okaloosa County.
Terrance R. Ketchel, Judge.

October 22, 2025

WINOKUR, J.

RT-Destin Associates, LLC, contracted to sell the Embassy Suites in Destin to NexPoint Real Estate Advisors, L.P. But after two amendments to the original agreement and breaches alleged by both sides, the contract was terminated, leaving in doubt which party would receive the $1.9 million deposit. RT-Destin sued for the deposit, and NexPoint counter-sued. After trial, the court awarded the deposit monies to NexPoint. Finding RT-Destin did

not breach the original agreement, or its amendments, we vacate the judgment and remand for further proceedings.[*]

I

On September 5, 2019, RT-Destin and NexPoint entered into an "Agreement for Sale and Purchase of Hotel: Embassy Suites, Destin, Florida." Closing was set for thirty days after the expiration of an "inspection period," which allowed NexPoint to carry out its due diligence on the Hotel's financial health and operations. The purchase price was set at $38 million, and a $400,000 deposit was required. Then, in November 2019, NexPoint sought to renegotiate a new purchase price, citing a downturn in the hotel market. But on November 5, 2019, NexPoint exercised its termination rights and notified RT-Destin it would not move forward with the Agreement. Nonetheless, on November 27, 2019, the parties entered into a new agreement, a "Reinstatement and Amendment to Agreement for Purchase and Sale of Hotel". That "First Amendment" called for an additional deposit, resulting in a total deposit of $1.9 million in escrow. It also provided for a reduced purchase price of $36.25 million, an updated assumption clause of the Existing Loan provision, and a new closing date, thirty days after the required approval of the assumption of the existing loan. Closing could run no later than March 26, 2020, because time was of the essence.

On February 26, 2020, the parties entered into a "Second Amendment to Agreement for Purchase and Sale of Hotel." There, the parties agreed to remove NexPoint's obligation to assume an existing mortgage loan and instead required defeasance of the existing loan term. That new provision called for NexPoint to pay any fees or costs associated with the defeasance process and to cooperate with RT-Destin to ensure it was completed by the March 26, 2020 closing.

---

[*] Because we remand the case for further proceedings, we do not address RT-Destin's second issue pertaining to prejudgment interest.

2

The next day, February 27, 2020, RT-Destin received a letter from its loan servicer to initiate the defeasance process. A $40,000 deposit was required to start the process. And under the Second Amendment, NexPoint was required to pay that deposit. RT-Destin communicated the need to transmit the monies to NexPoint on February 28, 2020, but never received any response from NexPoint.

Eventually, on March 10, 2020, RT-Destin issued NexPoint a notice of default. Rather than cure the non-compliance, NexPoint sought additional financial disclosures from RT-Destin on March 13, 2020. At that point, COVID-19 was reaching a peak in the United States, and the federal and state governments were beginning to enact shutdowns. RT-Destin provided NexPoint with updated financials, but not day-to-day bookings or other operational-level reports.

Then, on March 19, 2020, NexPoint sent RT-Destin a written notice of default under Sections 5.1(p) and 10.1(j) of the Original Agreement, claiming that RT-Destin was providing inaccurate financial information to NexPoint. The letter did not explain how the information provided was inaccurate; instead, it relied on NexPoint's assessment of COVID-19's impact on the hospitality industry. The letter also provided that NexPoint would not act on the purported defaults, opting to "remain[] committed to purchasing the [Hotel] pursuant to an assumption of the Existing Loan" because "finalizing the Defeasance of the Existing Loan and obtaining any new financing needed to acquire the [Hotel] has become not only impracticable, but an impossibility in the current environment[.]"

The next day, March 20, 2020, RT-Destin issued NexPoint a termination letter. The letter referred to NexPoint's default notice, which repudiated compliance with the defeasance term, and notified NexPoint that RT-Destin was electing to terminate the Original Agreement (as amended) because NexPoint expressly declined to comply with a material term and that it would not cure the non-compliance. RT-Destin sought a release of the $1.9 million deposit from escrow. Then, NexPoint countered with its own claims, and the escrow agent refused to release the deposit monies. The underlying action followed.

RT-Destin filed a civil complaint for breach of contract and declaratory judgment to obtain the $1.9 million deposit monies. NexPoint counter-sued, alleging the same, fraud, and breach of the implied covenant of good faith and fair dealing. RT-Destin argued at trial that NexPoint breached the Second Amended Purchase Agreement when it repudiated the defeasance term and refused to cure the non-compliance. While NexPoint argued that RT-Destin acted in bad faith, withholding the updated financial information of the Hotel's operations (as impacted by COVID-19) to push through the sale to NexPoint's detriment. That, it argued, was a breach of RT-Destin's obligation under the Original Agreement to provide NexPoint with updated representations.

Ultimately, the trial court entered judgment for NexPoint, awarding it the $1.9 million deposit. The trial court concluded that RT-Destin committed prior breaches of the Original Agreement, which warranted judgment in NexPoint's favor. But the trial court did not find or conclude if NexPoint committed a breach of the Original Agreement or the amendments. This appeal follows.

II

The trial court found for NexPoint on its breach of contract and declaratory judgment claims because it concluded that RT-Destin breached material terms of the Original Agreement. We review the trial court's interpretation of a contract de novo. *First Call 24/7, Inc. v. Citizens Prop. Ins. Corp.*, 333 So. 3d 1180, 1182 (Fla. 1st DCA 2022). And when interpreting a contract, we are limited to the plain language of the contract. *See Advanzeon Solutions, Inc. v. State ex rel. Fla. Dep't of Fin. Servs.*, 321 So. 3d 911, 915 (Fla. 1st DCA 2021).

A

First, NexPoint argued that under section 10.1(j) of the Original Agreement, RT-Destin had an ongoing obligation to inform NexPoint if any representations or warranties made in the Original Agreement materially changed. Section 10.1(j) provides, "If [RT-Destin] obtains actual knowledge of any event or

4

circumstance that constitutes a material change to any of [RT-Destin]'s representations and warranties set forth in this Agreement, [RT-Destin] shall promptly notify [NexPoint]." The trial court agreed that RT-Destin violated this provision. In fact, a closer look at what representations and warranties "set forth in [the Original] Agreement" section 10.1(j) addresses leads to a different conclusion. A correct analysis requires us to read section 10.1(j) together with sections 5.1(j) and 5.1(p) and leads us to conclude that RT-Destin did not violate the agreement.

B

i

In section 5.1(p) of the Original Agreement, RT-Destin represented and warranted that

The Financial Statements provided by [RT-Destin] to [NexPoint] are the Financial Statements that [RT-Destin] [ ] received from Manager, and [RT-Destin] has no actual Knowledge as to the accuracy or material inaccuracy of such operating statements. To [RT-Destin]'s Knowledge, the financial statements fairly represent the financial performance of the operations of the Hotel for the periods covered thereby.

Reading sections 10.1(j) and 5.1(p) together, RT-Destin had an obligation to inform NexPoint of any material changes to the financial statements that showed the Hotel's financial performance. NexPoint argues that this conclusion alone is enough to succeed. But that reading ignores two additional modifiers: the definition of Financial Statements and the "the periods covered thereby" language in the provision.

First, in the Definitions section of the Original Agreement, Financial Statements are defined as "The year to date and prior three (3) calendar years' income and expense statements for the Hotel provided by [RT-Destin] to [NexPoint]." That definition limits the scope of section 5.1(p). Rather than provide ongoing financial statement disclosures, the provision calls for the disclosure of only income and expense statements for the Hotel for the year to date and the prior three calendar years from the

5

effective date of the Original Agreement, which was September 5, 2019. To read "financial statements" to mean some documents or reports separate and distinct from those defined in the Original Agreement as "Financial Statements" is to write a new definition into the contract. *See Southern Crane Rentals, Inc. v. City of Gainesville*, 429 So. 2d 771, 774 (Fla. 1st DCA 1983) ("Where a contract is simply silent as to a particular matter, courts should not, under the guise of construction, impose on the parties' contractual rights and duties which they themselves omitted." (citation omitted)).

And when we look at the language used in the provision, we see parallels in both sentences. The first sentence speaks about "operating statements" and the second about the "financial performance of the *operations* of the Hotel." Logically—and textually—it follows that "financial statements" are "Financial Statements." *See cf. Holmes v. Florida A&M Univ. by and Through Bd. of Trs.*, 260 So. 3d 400, 405–06 (Fla. 1st DCA 2018) ("The law is also well-settled that courts are required 'to read provisions of a contract harmoniously in order to give effect to all portions thereof.' . . . A contract 'should be considered as a whole, not in its isolated parts.'" (citations omitted)).

In summary, RT-Destin represented that the Financial Statements provided, for the period specified in the Original Agreement, were accurate and correct when made. And therefore, section 10.1(j) obligated RT-Destin to update NexPoint if any information comes to light that those Financial Statements were not correct when made, and to correct them. That does not, however, mean that RT-Destin was obligated to provide ongoing Financial Statements about the Hotel's operation beyond the period defined in the Original Agreement.

ii

The second representation and warranty clause NexPoint relied on was section 5.1(j), which states the following:

> [RT-Destin] has not filed any petition in bankruptcy or other insolvency proceedings or proceedings for reorganization of [RT-Destin] or for the appointment of a

6

receiver or trustee for all or any substantial part of [RT-Destin]'s property, nor has [RT-Destin] made any assignment for the benefit of its creditors or filed a petition for an arrangement, or entered into an arrangement with creditors or filed a petition for an arrangement with creditors or otherwise admitted in writing its inability to pay its debts as they become due.

NexPoint argues that RT-Destin breached this provision when it sought a forbearance of its loan on the Hotel. The trial court agreed, but we do not.

The phrase "arrangement with creditors" is not defined in the Original Agreement, so we must look to the ordinary, plain meaning of that phrase. *Walls v. S. Owners Ins. Co.*, 321 So. 3d 856, 858 (Fla. 1st DCA 2021). Given the plain language of the provision, we cannot conclude that RT-Destin made an "arrangement with creditors" in a way that showed it had an inability to pay its debts.

First, there is a temporal aspect to this case that negates any potential "arrangement with creditors" breach. RT-Destin contacted its loan servicer on March 18, 2020, to ask whether the servicer could reach some arrangement that would see a temporary relief in RT-Destin's loan obligations for thirteen properties (the subject property included). RT-Destin argues this was because it was clear that NexPoint had no intention of closing on the sale under the then-current terms of the Original Agreement. The record supports that belief. The next day, on March 19, 2020, NexPoint mailed RT-Destin a letter informing it that NexPoint saw defeasance as an impossibility and wanted to move forward with the sale under an assumption of the loan term.

The timeline of events suggests that NexPoint repudiated one of the material terms of the agreement—compliance with the defeasance process—on March 19, 2020, and RT-Destin had not yet made an "arrangement" with its loan servicer. As of March 18, 2020, all RT-Destin had done was ask about what could be done with their loans. No arrangement had yet been reached before NexPoint informed RT-Destin of its repudiation. For this reason

7

alone, RT-Destin's decision to seek forbearance of its loan is insufficient to satisfy a material breach of section 5.1(j).

Moreover, RT-Destin's "arrangement" with its loan servicer did not demonstrate that it was unable to pay its loan obligations as they came due—a requirement of section 5.1(j). Rather, the request was seeking an arrangement with its loan servicer for accommodations during the COVID-19 pandemic because RT-Destin was a long-term borrower.

Thus, the trial court erred in concluding—based on its reading of the Original Agreement and insufficient evidence—that RT-Destin committed a prior-in-time breach of the Original Agreement.

C

NexPoint also argued RT-Destin breached section 9.1(c) of the Original Agreement. The alleged breach was also a result of RT-Destin not providing NexPoint with updated financial documents. Section 9.1(c) states as follows:

> Except for representations and warranties that by their terms speak only as of a specified date . . . the representations and warranties of [RT-Destin] shall be true and correct in all material respects on the Closing Date as if remade on the Closing Date . . . provided that [RT-Destin's] representations and warranties shall not be deemed inaccurate or breached if (i) such inaccuracy or breach is due to transactions or actions expressly permitted by, or approved in accordance with, this Agreement or due to changes in fact after the Effective Date beyond [RT-Destin's] reasonable control that are not material and that do not constitute or result from a willful or intentional default by [RT-Destin] of the material covenants applicable to it under this Agreement, including, without limitation, a default by any party other than [RT-Destin] or any of its Affiliates to any agreement relating to the [Hotel] . . . . Notwithstanding the foregoing, if any representation and warranty of [RT-Destin] is no longer true in all material respects as of the

Closing Date and [NexPoint] did not have actual knowledge thereof prior to the expiration of the Inspection Period, then if such change in fact has a material adverse effect on the valuation or operation of the [Hotel] . . . or prevents [NexPoint] from assuming the Existing Loan or obtaining a Replacement Franchise Agreement, [NexPoint] shall have the right to terminate this Agreement by giving written notice to such effect to [RT-Destin] on or before the Closing Date . . . and [NexPoint] shall have the rights set forth in Section 15.2 of this Agreement . . . . If, prior to the Closing, [NexPoint] has actual knowledge that any representation or warranty of [RT-Destin] is untrue or that [RT-Destin] has not complied with any of its covenants under this Agreement and [NexPoint] nonetheless proceeds with the Closing, [RT-Destin] shall have no liability for any such matter within [NexPoint's] actual knowledge prior to Closing.

First, section 9.1(c) provides that representations and warranties shall be the same when made as if they were made at closing. That initial provision undercuts NexPoint's argument that RT-Destin had an ongoing obligation to provide updated information and reports. Rather, the provision provides that any representations and warranties made must be the same when made and at closing. NexPoint fails to show how COVID-19 had an impact on the material representations made by RT-Destin about its Financial Statements between 2016–2019.

The first clause of section 9.1(c) means that, for example, if RT-Destin became aware that calculations or preparations of its Financial Statements—which it made representations about— were erroneous and indeed the final numbers of the Statements should have been different, then RT-Destin would have been obligated to inform NexPoint of those changes. And because nothing about the Financial Statements turned over to NexPoint by RT-Destin was made untrue by the downturn of COVID-19, we cannot conclude that RT-Destin breached this provision of section 9.1(c).

NexPoint also argues that RT-Destin breached a second clause of section 9.1(c) which allows it to terminate the Original Agreement "if any representation and warranty of [RT-Destin] is no longer true in all material respects" and it has "a material adverse effect on the valuation or operation of the [Hotel]" or if it "prevents [NexPoint] from assuming the Existing Loan or obtaining a Replacement Franchise Agreement." We find that the record lacks competent, substantial evidence to support the trial court's finding that RT-Destin breached this provision.

Moreover, all of section 9.1(c) relies on the last sentence of the provision. It provides that if NexPoint has knowledge (before closing) that RT-Destin withheld information that materially impacted the valuation of the Hotel, and NexPoint, nevertheless, proceeds to closing, then RT-Destin "shall have no liability for any such matter within [NexPoint]'s actual knowledge prior to Closing." The plain meaning of this clause is clear: NexPoint cannot sit on information that the valuation or operations of the Hotel have been materially altered; otherwise, NexPoint releases RT-Destin of all liability related to that information. That is what NexPoint did here.

NexPoint's March 19 letter informed RT-Destin that NexPoint was aware that the financial statements and forecasts provided by RT-Destin were "outdated and inaccurate." Regardless of whether NexPoint's position was true, its acknowledgment of the potential inaccuracy, which NexPoint argued impacted the Hotel's operations, is enough to trigger the last clause of section 9.1(c). Not only does the letter detail NexPoint's "knowledge" about the material change it alleges was withheld by RT-Destin, but it also provides that NexPoint was forgoing that default to close on the contract with a new assumption of the loan term. That conduct is what the plain language of section 9.1(c) covers.

Accordingly, RT-Destin cannot be liable for withholding information that NexPoint knew was untrue or "inaccurate" when NexPoint chose to ignore that fact and proceed to closing. Thus, the trial court erred in concluding that RT-Destin breached Section 9.1(c).

## III

We hold that the trial court erred in finding that RT-Destin breached the Original Agreement; thus, the trial court's final judgment in favor of NexPoint is VACATED, and the case is REMANDED for the trial court to consider whether NexPoint breached the Original Agreement or its amendments in determining whether final judgment should be in RT-Destin's favor.

ROWE and NORDBY, JJ., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

Seth M. Schimmel and David R. Sutton of Phelps Dunbar LLP, Tampa; Danielle Mashburn-Myrick of Phelps Dunbar LLP, Mobile, Alabama; Steven L. Brannock, Philip J. Padovano, and Joseph T. Eagleton of Brannock Berman & Seider, Tampa, for Appellant.

Barry Richard of Barry Richard Law Firm, Tallahassee; Ben Gordon and Anne Izzo of AnchorsGordon, P.A., Fort Walton Beach, for Appellee NexPoint Real Estate Advisors, L.P.; Cynthia Baines and Michele A. Cavallaro of Fidelity National Law Group, Fort Lauderdale, for Appellee FNF Lawyers Title of Texas, Inc., d/b/a Lawyers Title Company.